## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

AT&T Mobility Services, LLC,                     Case No. 1:19cv2539

                          Plaintiff,

          -vs-                                    JUDGE PAMELA A. BARKER

Robert Boyd,
                                                  MEMORANDUM OPINION AND
                          Defendant.              ORDER

      This matter comes before the Court upon the Motion to Compel Arbitration and for Preliminary Injunction ("Motion to Compel Arbitration") of Plaintiff AT&T Mobility Services, LLC ("AT&T").  (Doc. No. 3.)  Defendant Robert Boyd ("Boyd") filed a brief in opposition to AT&T's Motion to Compel Arbitration on November 22, 2019, to which AT&T replied on December 5, 2019.  (Doc. Nos. 10, 13.)  The Court also held an evidentiary hearing on AT&T's Motion to Compel Arbitration on August 28, 2020, which was continued to and completed on September 23, 2020.  (Doc. Nos. 32, 39.)

      Also, currently pending is Boyd's Brief Regarding the Court's Lack of Jurisdiction Over This Matter and Request for Sanctions ("Motion to Dismiss"), filed on September 30, 2020.  (Doc. No. 43.)  AT&T responded to Boyd's Motion to Dismiss on October 7, 2020.  (Doc. No. 44.)

      For the following reasons, Boyd's Motion to Dismiss (Doc. No. 43) is DENIED, and AT&T's Motion to Compel Arbitration (Doc. No. 3) is GRANTED.

### I.    Background

      Boyd worked for AT&T at various retail locations from 2010 until he was terminated in July 2019.  (Doc. No. 1-2 at ¶ 4; Doc. No. 10-1 at ¶ 4.)  On July 15, 2019, Boyd filed a Complaint in the

Cuyahoga County Court of Common Pleas against AT&T Services, Inc. and AT&T Area Manager Megan Mannot ("Mannot"), alleging state law claims of race discrimination, harassment, retaliation, violation of public policy, and wage and hour violations.  *See Boyd v. AT&T Services, Inc.*, Cuyahoga County Court of Common Pleas, Case No. CV-19-918231.  Boyd filed an Amended Complaint on August 8, 2019 raising the same claims, but naming AT&T Mobility Services, LLC and Mannot as defendants.  *Id*.

Subsequently, on October 30, 2019, AT&T filed the instant action in this Court, in which it seeks orders (1) compelling the arbitration of Boyd's claims pursuant to the Federal Arbitration Act ("FAA"), and (2) prohibiting Boyd from litigating his claims in the state court action referenced above.  (Doc. No. 1.)  On that same date, AT&T filed its Motion to Compel Arbitration, seeking the same relief.  (Doc. No. 3.)  Boyd filed a brief in opposition to AT&T's Motion to Compel Arbitration on November 22, 2019, to which AT&T replied on December 5, 2019.  (Doc. Nos. 10, 13.)[1]

The evidence submitted by the parties in conjunction with their briefing on AT&T's Motion to Compel Arbitration showed the following.  Boyd began his employment with AT&T in 2010.  (Doc. No. 10-1 at ¶ 4.)  In March 2017, Boyd worked as an Assistant Manager at an AT&T retail store located in Fairview Park, Ohio.  (*Id*. at ¶ 5.)  Several months later, in May or June 2017, Gerald Cummings ("Cummings") became the Store Manager of the Fairview Park location and, as such, was Boyd's direct supervisor.  (*Id*. at ¶ 6; Doc. No. 1-4 at ¶ 4.)

---

[1] On October 31, 2019, AT&T filed a motion in the state court action to stay those proceedings "until after the U.S. District Court determines whether [Boyd's] claims must be pursued in arbitration."  *See Boyd v. AT&T Services, Inc.*, Cuyahoga County Court of Common Pleas, Case No. CV-19-918231.  Boyd filed a response in the state court action indicating he did not oppose the motion.  *Id*.  As a result, the state court stayed the case on November 12, 2019.  *Id*.

As an AT&T employee, Boyd had an email account and a "point of sale" account (referred to as an "OPUS" account), each of which required a unique user identification ("UID") and password. (Doc. No. 10-1 at ¶ 6.)  At all times relevant herein, Boyd's UID was RB181Q, and his AT&T email address was RB181Q@us.att.com.  (Doc. No. 1-3 at ¶ 5; Doc. No. 1-4 at ¶ 6.)  As part of his position as Assistant Manager, Boyd was required to monitor emails received at his RB181Q@us.att.com email account and "respond appropriately."  (Doc. No. 1-4 at ¶ 7.)  Many work-related communications containing information necessary to perform his job were transmitted by email.  (*Id.*)

AT&T uses a software program called Promenta to widely distribute documents and emails (including communications regarding AT&T policies) to large groups of its employees.  (Doc. No. 1-3 at ¶ 9; Doc. No. 1-5 at ¶ 4.)  On July 12, 2017, using Promenta, AT&T Lead HR Specialist/Generalist Brandy Giordano ("Giordano") sent an email with the subject line "Action Required:  Notice Regarding Arbitration Agreement."  (Doc. No. 1-3 at ¶¶ 4, 11.)[2]  This email stated:

> AT&T has created an alternative process for resolving disputes between the company and employees.  Under this process, employees and the company would use independent, third-party arbitration rather than courts or juries to resolve legal disputes.  Arbitration is more informal than a lawsuit in court, and may be faster.
>
> The decision on whether or not to participate is yours to make.  To help you make your decision, **it is very important for you to review the Management Arbitration Agreement linked to this email.**  It provides important information on the process and the types of disputes that are covered by the Agreement.
>
> Again, the decision is entirely up to you.  To give you time to consider your decision, the company has established a deadline of no later than 11:59 p.m. Central Standard Time on Monday, September 11, 2017 to opt out -- that is, decline to participate in the arbitration process -- using the instructions below.

---

[2] This email was sent to "all of AT&T's U.S.-based employees who had either recently been promoted to a management position since the prior round of notifications about the Arbitration Program, or who had been on a leave of absence during the period when the prior notifications went out."  (Doc. No. 1-3 at ¶ 11.)

3

If you do not opt out by the deadline, you are agreeing to the arbitration process as set forth in the Agreement.  This means that you and AT&T are giving up the right to a court or jury trial on claims covered by the Agreement.

**Instructions for "Opting Out" of the Agreement:**

**To opt out of the agreement, after you open the attached document, follow the link provided there to the site where you will be able to electronically register your decision to opt out.**  The company will acknowledge in writing that it has received your opt-out request, and an opt-out attempt is invalid unless and until the company's acknowledgement is sent.  If you have attempted to opt out and have not received the confirmation, please email the Management Arbitration Agreement team at g04780@att.com.

Remember, the decision is yours.  There are no adverse consequences for anyone opting out of the Management Arbitration Agreement.  If, contrary to this assurance, you believe you have experienced any pressure or retaliation in connection with your decision, please contact the AT&T Hotline (888-871-2622).

If you have any questions about the Agreement, please contact OneStop (Dial 1-888-722-1787, then speak "Employee Service Hotline").

**Important:  September 11, 2017 is the deadline to act if you do not wish to resolve disputes through arbitration.**

(*Id.* at PageID# 38.)  The Management Arbitration Agreement ("Arbitration Agreement") itself could be accessed by clicking on a hyperlink contained in the email.  (*Id.*)  This link took the recipient to the AT&T intranet page, which could not be accessed until the person attempting to view it logged into AT&T's systems with a valid UID and password (referred to as the employee's "Global Log-In").  (*Id.* at ¶¶ 12-13.)  Once the employee logged in, he or she could review the entirety of the Arbitration Agreement and click on a button marked "Review Completed."  (*Id.*)  The Promenta system was configured to record the date and time on which each user accessed the Arbitration Agreement and clicked the "Review Completed" button.  (*Id.* at ¶ 13.)

4

The Arbitration Agreement provides that it is governed by the FAA and that "any dispute to which this Agreement applies will be decided by final and binding arbitration instead of court litigation."  (*Id.* at PageID# 40.)  It describes the claims covered by the agreement as follows:

> This agreement applies to any claim that you may have against any of the following: (1) any AT&T company, (2) its present or former officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, and all successors and assigns of any of them; and this agreement also applies to any claim that the Company or any other AT&T company may have against you.  Unless stated otherwise in this Agreement, covered claims include without limitation those arising out of or related to your employment or termination of employment with the Company and any other disputes regarding the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, defamation, retaliation, discrimination or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Genetic Information Non-Discrimination Act, and state statutes and local laws, if any, addressing the same or similar subject matters, and all other state and local statutory and common law claims.  This Agreement survives after the employment relationship terminates.

(*Id.* at PageID#s 40-41.)

Reminder emails regarding the Arbitration Agreement and the September 11, 2017 opt-out deadline (which were identical to the July 12, 2017) email were sent on July 27, 2017 and August 11, 2017.  (*Id.* at ¶ 14; Doc. No. 1-5 at ¶ 8.)

In support of its Motion to Compel Arbitration, AT&T also submitted evidence that it contends shows that Boyd received all three of the Arbitration Agreement emails discussed above. Specifically, AT&T submitted the declaration of Jeremy Dunlap ("Dunlap"), an Application Development Specialist at Accenture, which "has provided AT&T with consulting services including technical support for various computer systems and software applications utilized by AT&T," including Promenta.  (Doc. No. 1-5 at ¶¶ 3-4.)  Dunlap averred that emails with the subject heading "Action Required:  Notice Regarding Arbitration Agreement" were sent to Boyd's AT&T email

account at RB181Q@us.att.com on July 12, 2017, July 27, 2017, and August 11, 2017.  (*Id.* at ¶ 8; *see also id.* at PageID# 60.)  Dunlap further averred that AT&T's records show that the Arbitration Agreement was accessed on August 14, 2017 by someone logged in using Boyd's AT&T username— RB181Q.  (*Id.* at ¶ 9; *see also id.* at PageID# 62.)  He states that AT&T's records also reflect that the same user clicked the button marked "Review Completed" at the bottom of the Arbitration Agreement that same date.  (*Id.* at ¶ 10; *see also id.* at PageID# 64.)  The records submitted with Dunlap's declaration show that the "Review Completed" button was clicked six seconds after the user accessed the Arbitration Agreement.  (*Id.* at PageID#s 62, 64.)

It is undisputed that Boyd did not opt out of the Arbitration Agreement by the September 11, 2017 deadline.  However, in his declaration opposing AT&T's Motion to Compel Arbitration, Boyd claims that he "did not receive any emails regarding the [Arbitration Agreement]."  (Doc. No. 10-1 at ¶ 15.)  He asserts that there was a "common company practice" of Assistant Managers sharing their UIDs and passwords with sales representatives and support staff, so they could access the Assistant Manager's AT&T accounts to retrieve codes that were needed to perform certain business transactions, including returns, overrides, inventory check-ins, inventory accounts, and pricing adjustments.  (*Id.* at ¶ 10.)  Boyd avers that he followed this "common practice" and shared his passwords when he was Assistant Manager at the Fairview Park store.  (*Id.*)

Boyd also claims that he shared his UID and password with Cummings.  (*Id.* at ¶ 8.) Specifically, he claims that, when Cummings first assumed the position of Store Manager at the Fairview Park location, Cummings did not have his own credentials to access email and OPUS.  (*Id.*) Boyd alleges that Cummings therefore directed Boyd to provide him with his UID and password, and Boyd complied. (*Id.*)  Cummings, on the other hand, states in his declaration submitted on behalf of

AT&T that his "understanding is and always has been that asking for or disclosing an individual's passwords is contrary to AT&T policy."  (Doc. No. 1-4 at ¶ 9.)  He stated that "at no point have I ever asked for or known Boyd's passwords."  (*Id.*)

After reviewing the parties' submissions with respect to AT&T's Motion to Compel Arbitration, including the conflicting declarations and evidence regarding whether Boyd ever received the Arbitration Agreement emails or reviewed the Arbitration Agreement, the Court found that an evidentiary hearing was necessary to determine whether an enforceable arbitration agreement was formed between AT&T and Boyd.  (Doc. No. 15.)  The Court initially set the hearing for February 18, 2020.  (*Id.*)  However, the hearing had to be rescheduled multiple times due to conflicts with the parties' schedules and the COVID-19 pandemic.  As such, the Court was not able to hold the hearing until August 28, 2020, at which time the hearing was conducted via video teleconferencing at the request of the parties.  (Doc. Nos. 24, 32.)  The parties were unable to complete their presentation of evidence within the time allotted on August 28, 2020, so the hearing was continued to and completed on September 23, 2020.  (Doc. Nos. 32, 39.)

During the hearing, the testimony and evidence presented by the parties largely mirrored that submitted in conjunction with AT&T's Motion to Compel Arbitration.  Giordano, Dunlap, Wendi Wilson ("Wilson"), and Jeff Nahlik ("Nahlik") testified on behalf of AT&T.  Consistent with her declaration, Giordano testified that as an HR Specialist/Generalist, her responsibilities included the facilitation of the Arbitration Agreement campaign.  She further averred that, using Promenta, she distributed the Arbitration Agreement email to AT&T employees, with the first email being sent on July 12, 2017.  She also described how, after clicking on the link at the bottom of the email, employees would have to enter their Global Log-In information in order to access the Arbitration Agreement.

With respect to the Arbitration Agreement itself, Giordano confirmed that it contained a review and acknowledge button that employees could click to indicate that they had reviewed it.  She stated that until employees had done this, they would receive reminder emails every two weeks.  She also testified that she did not find any emails from Boyd in an Arbitration Agreement inbox that she monitored, which would have included any out-of-office or undeliverable messages that resulted from the Arbitration Agreement emails sent to Boyd's email address.  Finally, she testified that she did not have any record of Boyd opting out of the Arbitration Agreement.

Dunlap similarly testified to much of the same information provided in his declaration.  He stated that AT&T used Promenta to send the Arbitration Agreement to employees in 2017.  According to Dunlap, Promenta tracks the emails that are sent, the first time that users click and read the Arbitration Agreement, and when users click on the review button within the Arbitration Agreement.  He also testified that records generated by Promenta showed that the Arbitration Agreement email was sent to RB181Q@us.att.com, which is Boyd's email address, on July 12, 2017, July 27, 2017, and August 11, 2017.  These records also indicated all three emails had been successfully sent, although he admitted the records did not show whether the emails were successfully delivered.

Dunlap also described how Promenta was configured to record the user, date, and time when an employee clicked on the link within the Arbitration Agreement email and logged in through AT&T's Global Log-In using his or her UID and password to view the Arbitration Agreement.  Dunlap testified that when he searched the records generated by Promenta to determine whether Boyd had accessed the Arbitration Agreement, he found that the Arbitration Agreement was opened by someone logged in using the AT&T username RB181Q, which is Boyd's username, on August 14, 2020.  He further stated that a search of his records indicated that the same user clicked the button

8

acknowledging review of the Arbitration Agreement on the same date. Specifically, Dunlap confirmed that his records showed the user opened the agreement at 4:59:43 p.m. Pacific Time on August 14, 2020 and clicked on the review button six second later at 4:59:49 p.m. Pacific Time.

Dunlap also admitted that if employees had already authenticated themselves through AT&T's Global Log-In prior to clicking on the link in the Arbitration Agreement email, they would not have to log in again to view the Arbitration Agreement. Rather, after clicking the link, they would be taken to the Arbitration Agreement without having to log in a second time. However, he also clarified that an employee simply logging onto a computer and opening his or her email does not go through AT&T's Global Log-In, so the employee would still have to login using his or her UID and password in order to access the Arbitration Agreement after clicking on the link in that case.

Also testifying on behalf of AT&T, Wilson indicated that Boyd was one of her Assistant Managers when she was an Area Retail Sales Manager for AT&T in 2017. According to Wilson, sales employees in AT&T stores are paid partly based on commission, and AT&T generally kept track of employees' sales for their commission through employees logging onto the point of sale system, OPUS, using their own credentials. If not logged in under their own credentials when they made a sale, employees would have to go through a reconciliation process to get credit for the sale. She also stated that each employee had their own iPad to complete customer transactions and that there was usually an extra iPad in case a battery died. But she did admit that there have been instances where employees had to share an iPad. She further testified that when an employee did log in to a desktop computer within the store, they were taught to lock the computer before walking away to another task. If they failed to log out, the computer would also time out in one to two minutes. She also testified that she often communicated with Boyd via email.

AT&T's final witness was Nahlik, an Associate Director of Technology.  He testified that the email address from which the Arbitration Agreement was sent to employees is an address in AT&T's global address list, which means that emails from that address are excluded from antispam processing.  He also stated that if an email was sent to a mailbox that was full, the email system would send a non-delivery receipt to the sender indicating that the mailbox is full and could not accept the email.

During the hearing, Boyd and another former AT&T employee, Samuel Irizarry ("Irizarry"), testified on Boyd's behalf.  Boyd testified that managers often gave away their passwords to other employees.  For example, he gave his password to Cummings when Cummings began working at Boyd's store because Cummings codes did not work at first.  He also stated that he often received calls from sales employees in his store when no manager was at work because they needed a manager's UID and password in order to complete a transaction with a customer, as there were certain transactions that only a manager could perform.  According to Boyd, employees also would use autofill to enter a manager's UID and password when they needed the authority to complete a task on the computer.

Boyd also testified that in addition to iPads, most AT&T stores had one computer on the sales floor to which all employees had access.  He further stated that there were times when he was working on a computer when he walked away without locking the computer.  He noted a variety of reasons this may have occurred, such as not wanting to lose progress on a training or rushing to meet a customer that came into the store in line with AT&T's policies to quickly greet all customers.  He stated that when coming back to a computer after he had walked away without locking it, he often would see an email pulled up that had not previously been on his screen or discover that another

employee was on the computer without realizing that the computer was still logged in under Boyd's credentials.  He said this mix up sometimes caused trainings to be completed by someone else.

When asked about the Arbitration Agreement at issue, Boyd testified that he had never heard of arbitration nor read the Arbitration Agreement until the instant action.  Boyd also admitted, however, that AT&T often communicated information about his employment to him via email and that it was part of his job to review and respond to emails.  Boyd also stated that he received a hundred or more emails a day and could not specifically remember what emails he received the three days on which AT&T sent the Arbitration Agreement emails.

Finally, Irizarry also testified on behalf of Boyd.  He stated that he worked for AT&T from 2016 to 2018, including for a period of time as a sales representative.  As a sales representative, he reported to Boyd for a period of three to four months.  Irizarry testified there were typically two to three desktop computers in AT&T stores that everybody had access to, although only one computer was on the sales floor.  Consistent with Boyd's testimony, he also stated that managers had different privileges when logged on to computers.  For example, only managers were able to complete certain types of overrides or returns.  He stated that when managers were not physically in the store, they would typically share their password with someone at the store so that transactions only a manager had the authority to complete could be performed by those at store.  According to Irizarry, this happened quite often.  Irizarry also corroborated Boyd's testimony that employees often logged on to a computer and walked away without logging off.  As a result, Irizarry stated employees occasionally rung customers out on other people's accounts.  However, he did not recall ever accidentally reading another employee's email.

11

During closing arguments at the conclusion of the hearing on September 23, 2020, Boyd's counsel stated for the first time that whether Boyd entered into the Arbitration Agreement is a question for the jury. During that hearing, Boyd's counsel also raised for the first time the issue of the Court's jurisdiction over the instant matter, noting that the FAA itself does not provide for federal jurisdiction and that there would be no diversity jurisdiction over the underlying state court action filed by Boyd against AT&T and Mannot, as both Boyd and Mannot are citizens of Ohio. Because the issue had not been raised before, the Court set a briefing schedule on the jurisdictional question.

The parties complied with that scheduled, and, on September 30, 2020, Boyd filed a brief addressing whether the Court has jurisdiction over this action, which the Court will construe as a Motion to Dismiss for lack of jurisdiction. (Doc. No. 43.) In Boyd's Motion to Dismiss, he also requests that the Court assess sanctions on AT&T and/or its counsel for filing this action without adequate support for jurisdiction and reiterates his request that the Court submit the question of whether Boyd agreed to arbitrate his claims to a jury. (*Id.* at PageID#s 530-33.) AT&T responded to Boyd's Motion to Dismiss on October 7, 2020. (Doc. No. 44.)

As such, both AT&T's Motion to Compel Arbitration and Boyd's Motion to Dismiss are ripe for consideration. Because jurisdiction is a threshold issue, the Court first will address Boyd's Motion to Dismiss.

## II.  Boyd's Motion to Dismiss

### a.  Standard of Review

When subject matter jurisdiction is challenged in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Motions under Rule

12

12(b)(1) "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A *facial* attack is a challenge to the sufficiency of the pleading itself." *Id.* Thus, the complaint's material allegations must be taken as true and construed in the light most favorable to the nonmoving party. *Id.* On the other hand, factual attacks challenge "the factual existence of subject matter jurisdiction." *Id.* In that case, the court is free to weigh the evidence before it without a presumption of truthfulness. *Id.* Boyd asserts that he has set forth a factual attack on jurisdiction (Doc. No. 43 at PageID#s 525-26), although it is does not appear that any facts relevant to jurisdiction are in dispute. Regardless of whether Boyd has set forth a facial or factual challenge to jurisdiction, however, the Court finds that jurisdiction is present.

### b. Analysis

In support of his Motion to Dismiss, Boyd contends that the FAA does not provide a basis for federal jurisdiction, but instead permits jurisdiction only when a federal district court would have jurisdiction over the underlying dispute between the parties. (*Id.* at PageID#s 526-29.) Boyd argues that there is no federal jurisdiction over the underlying dispute in this case because the parties to the underlying state court action are not completely diverse, as both Boyd and Mannot are citizens of Ohio. (*Id.*) Thus, Boyd asserts this Court has no jurisdiction over this action as well. (*Id.*) In response, AT&T asserts that this Court should not look through the present action to the underlying state court action to determine whether it has diversity jurisdiction. (Doc. No. 44 at PageID#s 550-54.) Rather, AT&T argues that because Mannot is not a party to the instant matter and is not an indispensable party under Fed. R. Civ. P. 19, her citizenship is irrelevant to this Court's jurisdiction. (*Id.*) According to AT&T, it is sufficient that the Court has diversity jurisdiction over the instant

13

action between AT&T and Boyd.  (*Id.*)  The Court agrees with AT&T and finds that it has diversity jurisdiction over this matter.

The FAA provides, in relevant part, that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  According to the Supreme Court, "[t]he Arbitration Act is something of an anomaly in the field of federal-court jurisdiction" because "[i]t creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 . . . or otherwise."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983).  Instead, "Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue."  *Id.*

As AT&T points out, there is no dispute that diversity jurisdiction exists when only considering the citizenship of the parties to the present action—AT&T and Boyd.  Federal courts have jurisdiction over all civil actions (1) "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs;" and (2) the case is between "citizens of different States." 28 U.S.C. § 1332(a).  Here, AT&T is a citizen of Delaware and Georgia,[3] and Boyd is a citizen of

---

[3] Because AT&T is a limited liability company, it has the citizenship of each of its members.  *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009).  AT&T's sole member is Cricket Holdco Inc., which is a Delaware corporation with its principal place of business in Atlanta, Georgia.  (Doc. No. 45 at ¶¶ 5-6.)

Ohio.  (Doc. No. 43 at 1; Doc. No. 1 at ¶ 2; Doc. No. 12 at ¶ 2.)  In addition, the amount in controversy between AT&T and Boyd exceeds $75,000.  (*See* Doc. No. 1 at ¶ 4; Doc. No. 12 at ¶ 4.)  Accordingly, as between AT&T and Boyd, the requirements for diversity jurisdiction are satisfied.

Thus, the only question is whether Mannot's presence as a defendant in the underlying state court action affects this Court's assessment of diversity jurisdiction given that Mannot and Boyd are citizens of the same state.  The Court finds that it does not.  Numerous courts in this circuit have held that in assessing whether diversity jurisdiction exists over an action to compel arbitration, it is not appropriate to look through to the citizenship of the parties to an underlying state court action.  *E.g.*, *BLC Lexington SNF, LLC v. Petersen*, No. 5:19-cv-00465-GFVT, 2020 WL 3130292, at *4 (E.D. Ky. June 12, 2020) (rejecting "Defendant's argument that the Court must 'look through' and consider the residence of the administrators" named in an action filed in state court); *GGNSC Stanford, LLC v. Gilliam*, 205 F. Supp. 3d 884, 888 (E.D. Ky. 2016) ("Despite [a] *prima facie* showing of complete diversity, [the defendant] insists that the Court should 'look through' to the complaint in the underlying state court action to determine whether complete diversity actually exists.  This Court, as well as others, have considered and rejected this argument."); *Brookdale Sr. Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 782 (E.D. Ky. 2014) ("[T]he Court will not look through the present action for arbitration to determine whether it would have diversity over the state-law suit.").  In so holding, courts have specifically distinguished the Supreme Court's holding in *Vaden v. Discover Bank*, 556 U.S. 49 (2009), finding that its direction to look through to an underlying state court action is limited to cases involving federal question jurisdiction—not diversity jurisdiction.  *E.g.*, *Brookdale*, 27 F. Supp. 3d at 782 ("[T]he Supreme Court limited its approval of the 'look through' doctrine to cases involving federal question jurisdiction.").

Moreover, while the Sixth Circuit has not addressed the question directly, other circuits agree that the citizenship of the parties to an underlying state court action is irrelevant to the question of diversity jurisdiction in a separate action filed in federal court to compel arbitration. *See Hermès of Paris, Inc. v. Swain*, 867 F.3d 321, 325 (2d Cir. 2017) ("All of our sister Circuits to have addressed the issue have likewise rejected a look-through approach to assessing complete diversity for the purposes of evaluating whether a district court has diversity jurisdiction over an FAA petition."); *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 871 (4th Cir. 2016) (holding the citizenship of "a defendant named in the original state court complaint" was irrelevant to a parallel federal proceeding to compel arbitration); *Northport Health Servs. of Ark., LLC v. Rutherford*, 605 F.3d 483, 491 (8th Cir. 2010) (concluding "diversity of citizenship is determined in these cases" compelling arbitration "by the citizenship of the parties named in the proceedings before the district court, plus any indispensable parties who must be joined pursuant to Rule 19," rather than the parties named in the parallel state court action); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1106 (9th Cir. 2002) (refusing to "consider the citizenship of . . . a defendant in the state court action," even though his presence would destroy diversity in the federal action to compel arbitration, because "the citizenship of someone not before the court is irrelevant to the jurisdictional inquiry"); *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 842 (7th Cir. 1999) (rejecting the argument that a federal court lacked jurisdiction to "compel arbitration when the damage claims for which arbitration is sought are pending in a non-removable state action").

Given the weight of this authority, the Court will not look through the present action to compel arbitration to determine whether it would have diversity jurisdiction over the state court suit. Although Mannot and Boyd are both citizens of Ohio, Mannot is not a party to the instant action and

her citizenship is therefore irrelevant.[4]  Because AT&T and Boyd are citizens of different states and

the amount in controversy requirement is satisfied, the Court concludes that it has jurisdiction over

the present action.  Accordingly, the Court will deny Boyd's Motion to Dismiss and proceed to an

assessment of AT&T's Motion to Compel Arbitration.[5]

## III.    AT&T's Motion to Compel Arbitration

### a.  Standard of Review

The FAA provides that an arbitration clause in "a contract evidencing a transaction involving

commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or

in equity for the revocation of any contract."  9 U.S.C. § 2.  "This provision establishes 'a liberal

federal policy favoring arbitration agreements'" and "requires courts to enforce agreements to

arbitrate according to their terms."  *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)

(quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24).  The FAA also "establishes that, as a matter

of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration, whether the problem at hand is the construction of the contract language itself or an

allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp.*, 460 U.S.

at 24-25.

---

[4] The Court also notes that the parties both agree that Mannot is not an indispensable party under Rule 19.  (Doc. No. 43 at PageID# 529; Doc. No. 44 at PageID# 551.)  The Court agrees as well.  *See PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 199, 206 (6th Cir. 2001) (holding the plaintiff's employee, who was named as a defendant in an underlying state court action, was not an indispensable party to the plaintiff's petition to compel arbitration filed in federal court).  As such, Rule 19 also does not preclude this matter from proceeding in this Court.  *See Northport*, 605 F.3d at 490-91 ("A traditional principle of diversity jurisdiction is that it cannot be defeated by a non-diverse joint tortfeasor who is not a party to the federal action, unless that party is indispensable under Rule 19.").

[5] The Court also denies Boyd's request for sanctions, which is based on his allegations that AT&T acted in bad faith by filing this suit without including Mannot and attempting to compel arbitration in a court that does not have jurisdiction. (Doc. No. 43 at PageID#s 530-32.)  Because AT&T's actions were appropriate in light of the authority discussed above, and this Court does, in fact, have jurisdiction over the instant matter, Boyd's request for sanctions clearly lacks merit.

The FAA further provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If the court finds that a party's claims are referable to arbitration, the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

"In determining whether to grant motions to dismiss or stay proceedings and compel arbitration, courts must apply a four-pronged test: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be arbitrated; and (4) whether to stay the remainder of the proceedings pending arbitration." *Uszak v. AT & T, Inc.*, No. 1:14CV2800, 2015 WL 13037500, at *3 (N.D. Ohio Oct. 6, 2015).

### b. Analysis

With respect to AT&T's Motion to Compel Arbitration, the only issues in dispute are whether the parties agreed to arbitrate, and, if so, whether the agreement is nonetheless unenforceable. Specifically, Boyd asserts he and AT&T never formed an agreement to arbitrate because he never received an offer to enter into the Arbitration Agreement, or, alternatively, never accepted that offer. (Doc. No. 10 at PageID#s 166-72.) Boyd also contends that even if an agreement was formed, the Arbitration Agreement is unenforceable because it is unconscionable and because he did not knowingly and voluntarily waive his right to a jury. (*Id.* at PageID#s 172-77.) The Court addresses each issue below.

18

### i.  Whether the Parties Agreed to Arbitrate

Boyd contends that he never received any emails containing the link to the Arbitration Agreement and therefore never received a valid offer from AT&T.  (*Id.* at PageID# 168.)  He also asserts that the evidence showing that someone accessed the Arbitration Agreement using his UID and password for only six seconds demonstrates that whoever accessed the agreement did not do so long enough to read, comprehend, or agree to its terms, further supporting his contention that he never received a valid offer or assented to the terms of the Arbitration Agreement.  (*Id.* at PageID#s 168-69.)  In contrast, AT&T asserts that Boyd received three emails containing AT&T's offer to enter into the Arbitration Agreement, that Boyd accessed and acknowledged his review of the Arbitration Agreement, and that he then accepted the offer by continuing his employment with AT&T and failing to opt-out by the deadline.  (Doc. No. 3-1 at PageID#s 122-25.)  Having considered the testimony and evidence provided at the evidentiary hearing, as well as the parties' earlier briefing, the Court finds that AT&T has met its burden to show that it entered into an agreement to arbitrate with Boyd.

Before reaching its assessment of the evidence, however, the Court will first address Boyd's contention that if there are questions of fact regarding the formation of an agreement to arbitrate, then the matter should be decided by a jury.  (Doc. No. 43 at PageID#s 532-33.)  The FAA provides, in relevant part:

> If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue.  ***Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.***

19

9 U.S.C. § 4 (emphasis added).  Thus, according to the plain language of Section 4 quoted above, Boyd was required to make his jury demand "on or before the return day of the notice of application." *Id.*  "Failure to do so results in a waiver."  *Uszak v. AT & T, Inc.*, No. 1:14CV2800, 2015 U.S. Dist. LEXIS 187992, at *3 (N.D. Ohio July 15, 2015).  The FAA does not define the "return day of the notice of application."  "However, Courts that have considered this issue have determined this to be the return day-i.e. due date for an opposition to a motion for an order to compel arbitration."  *Id.* at *4 (holding the plaintiff waived his right to a jury trial by failing to request a jury trial until after briefing was completed on the defendants' motion to compel arbitration and three weeks before the scheduled hearing date); *Townsend v. Stand Up Management, Inc.*, No.1:18CV2884, 2019 WL 3729266, at *6 (N.D. Ohio Aug. 8, 2019) (holding the plaintiffs waived their right to a jury trial by failing to request a jury trial until nearly a month after filing their opposition to the defendants' motion to compel arbitration).  In this case, Boyd did not request a jury trial on the issue of whether he agreed to the Arbitration Agreement until closing arguments following the completion of the evidentiary hearing on the issue, approximately ten months after he filed his brief in opposition to AT&T's Motion to Compel Arbitration.  Boyd's request is far too late, and the Court finds he has waived his right to a jury trial on this issue.  His request is therefore denied, and the Court will determine the merits of AT&T's Motion.

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)).  "Because arbitration agreements are

20

fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Id.* (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007)). Under Ohio law, "[f]or a valid contract to exist, there must be an offer on one side, an acceptance on the other side, and mutual assent between the parties with regard to the consideration for the bargain." *Uszak*, 2015 WL 13037500, at *3 (quoting *Tidewater Fin. Co. v. Cowns*, 968 N.E.2d 59, 63 (Ohio Ct. App. 1st Dist. 2011)). "Mutual assent 'ordinarily takes the form of an *offer* or proposal by one party followed by an *acceptance* by the other party or parties.'" *Dantz v. Am. Apple Grp., LLC*, 123 F. App'x 702, 707 (6th Cir. 2005) (citation omitted). "The party asserting the existence of a contract bears the burden of demonstrating its existence by a preponderance of the evidence." *Uszak*, 2015 WL 13037500, at *3.

In *Uszak*, another court from this district addressed whether AT&T had formed an agreement to arbitrate with another one of its employees, Brian Uszak ("Uszak"), under very similar circumstances. In that case, the evidence showed that AT&T sent an email, as well as two subsequent reminder emails, to Uszak informing him that AT&T had created an arbitration program for resolving disputes and that he could opt out of the program, but needed to do so by February 6, 2012. *Id.* at *5. The evidence also demonstrated that several days after the last reminder email was sent, someone logged in under Uszak's unique AT&T email and password, accessed the arbitration agreement, and clicked the review completed button a minute later. *Id.* Uszak asserted that he did not remember receiving the arbitration emails, that other employees knew his password, that managers shared their passwords so that other employees could provide customer service in the absence of a manager, and that employees sometimes completed other employees' training online. *Id.* at *5-6. Upon review of

this evidence, the court found that AT&T had met its burden to establish that the parties had entered

into a binding agreement to arbitrate, reasoning:

> There is no evidence another employee reviewed the arbitration agreement and clicked "Review Completed" on behalf of Uszak. No employee testified they logged in under Uszak's password and acknowledged having read the arbitration agreement for Uszak, nor did Uszak testify that someone else did it. There was no benefit to any employee to do so. Instead, the evidence demonstrates AT & T communicated with its employees through email and employees were instructed not to share passwords. Passwords may have been shared but only for the limited purpose of customer service in the absence of managers and possibly to complete employee online training. AT & T demonstrated it sent the emails to Uszak on multiple occasions and someone using Uszak's unique ID and password logged in to the intranet site on January 21, 2012 and clicked "Review Completed." No opt out of the arbitration agreement was sent to AT & T by February 6, 2012.

*Id.* at *6.

The Sixth Circuit affirmed the district court's decision on appeal. Specifically, the Sixth

Circuit found that "[t]he district court's determination that Uszak was the person who opened the

MAA e-mail and confirmed review of the e-mail was not clearly erroneous," noting that "Uzsak's

'evidence' that someone else clicked the 'Review Complete' button consists of pure conjecture: he

may have left his e-mail account open, and an unidentified other employee may have opened the

MAA e-mail and clicked the 'Review Complete' button." *Uszak v. AT & T Mobility Services LLC*,

658 F. App'x 758, 762 (6th Cir. 2016). The Sixth Circuit also rejected Uszak's argument that his

actions did not constitute acceptance under Ohio law, holding that Uszak "demonstrated his

agreement to be bound by the MAA through his failure to take any of the available steps to opt out

of the agreement." *Id.* at 763.

The Court agrees with the reasoning of the district court and the Sixth Circuit in *Uszak* and

likewise finds that AT&T has met its burden to establish that Boyd entered into the Arbitration

Agreement in this case. First, AT&T has established that Boyd received a valid offer to enter into

22

the Arbitration Agreement.  The evidence demonstrates that AT&T sent three emails to Boyd's AT&T email address informing him of the material terms of the Arbitration Agreement, providing a link to the actual agreement, and specifying that he would be agreeing to the arbitration process if he did not opt out by the deadline.  These emails were sent from an email address that was excluded from antispam processing, and none of them were returned as undeliverable, resulted in an out-of-office response, or resulted in a message that Boyd's mailbox was full.  AT&T often communicated information to Boyd via email, and he was responsible for monitoring and responding to emails sent to his AT&T email address.  This appears to be exactly what he did in this case, as it is undisputed that someone accessed the Arbitration Agreement using Boyd's UID and password and clicked the "Review Completed" button on August 14, 2017.

As in *Uszak*, Boyd's evidence that he was not the person that accessed and confirmed review of the Arbitration Agreement consists only of conjecture.  Boyd speculates that another employee may have done so because he sometimes walked away from store computers that others had access to without logging off and because he shared his UID and password with other employees.  However, he only shared his password so that other employees could complete certain customer service tasks when necessary, and there was no reason that another employee would have used Boyd's password to access his email and complete the Arbitration Agreement review.  Moreover, the evidence indicated that AT&T employees typically had their own iPads so that they did not need to share devices and would be incentivized to ensure they were logged in under their own credentials to get credit for the commission on their sales.  And even if another employee did accidentally start using a computer that was logged in under Boyd's credentials, access Boyd's email without realizing the mistake, and click on the link within the Arbitration Agreement email, the employee would still have

had to enter Boyd's UID and password at that point before accessing the Arbitration Agreement, unless Boyd had already authenticated himself using his Global Log-In information for some other reason before walking away from the computer.  This concurrence of events is simply too speculative. While Boyd testified that he did not remember ever receiving the Arbitration Agreement emails, he also stated that he received a hundred or more emails a day and could not specifically remember what emails he received the three days on which AT&T sent the Arbitration Agreement emails.  As such, the Court finds it much more likely that Boyd himself, rather than some other unknown employee, accessed the Arbitration Agreement and acknowledged his review of it.  As a result, the Court finds that Boyd received AT&T's offer to enter into the Arbitration Agreement.

Second, AT&T demonstrated that Boyd accepted the Arbitration Agreement.  Both the Arbitration Agreement emails and the Arbitration Agreement itself informed Boyd that he would be bound by the Arbitration Agreement if he did not opt out by September 11, 2017.  (Doc. No. 1-3 at PageID#s 38, 40.)  After receiving these notices and acknowledging his review of the Arbitration Agreement, Boyd continued his employment with AT&T past September 11, 2017 without opting out.  The fact that the evidence shows that Boyd reviewed the Arbitration Agreement for only six seconds before clicking the Review Completed button is not relevant.  His actions are sufficient to constitute acceptance.  *See Uszak*, 658 F. App'x at 763 ("An employee who signs a form (in this case, electronically) indicating that he understands his obligations if he chooses not to participate in an arbitration program, fails to take the required action to opt out, and never provides any other notice to management that he intends to opt out, has 'demonstrated his agreement to be bound' by an arbitration agreement.") (citation omitted); *Legair*, 213 F. App'x at 439 (finding "plaintiff by his conduct demonstrated his agreement to be bound" because he "failed to take the required action to

opt out"); *Dantz*, 123 F. App'x at 708 ("[P]laintiff, an at-will employee, manifested her assent in the very way that the Company requested, that is, by continuing her employment after October 1, 2001.").

Having determined that AT&T offered the Arbitration Agreement and Boyd accepted it, the Court concludes there was necessarily a sufficient manifestation of mutual assent to form a contract. *See Uszak*, 658 F. App'x at 764 ("In Ohio, mutual assent is manifested 'generally [by] offer and acceptance.'") (quoting *Schlaegel v. Howell*, 42 N.E.3d 771, 778 (Ohio Ct. App. 2d Dist. 2015)). Finally, because the promise to arbitrate claims was mutual, the Court also finds that adequate consideration existed. *See Dantz*, 123 F. App'x at 708-09 (holding consideration was present when "[b]oth the employee and the employer are required to take certain defined disputes to arbitration and be bound by the outcome").

Accordingly, the Court concludes that AT&T and Boyd entered into an agreement to arbitrate. In addition, there is no dispute that all of Boyd's claims are within the scope of the Arbitration Agreement. As a result, the parties must be compelled to arbitration unless the Arbitration Agreement is otherwise invalid, which the Court addresses next.

### ii. Whether the Arbitration Agreement is Unconscionable

Boyd asserts that the Arbitration Agreement should not be enforced because it is unconscionable under Ohio law, while AT&T disputes this and asserts the Arbitration Agreement is neither procedurally nor substantively unconscionable. (Doc. No. 10 at PageID#s 173-77; Doc. No. 13 at PageID#s 208-11.) Upon review of the parties' arguments, the Court finds that the Arbitration Agreement is not unconscionable.

The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. "One

25

such ground is unconscionability: If a party shows that an agreement to arbitrate is unconscionable, the agreement will not be enforced and, consequently, the parties will not be compelled to arbitrate their disputes." *Dreher v. Eskco, Inc.*, No. 3:08-CV-325, 2009 WL 2176060, at *14 (S.D. Ohio July 21, 2009).

In Ohio, "[u]nconscionability includes both 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 358 (2008) (quoting *Lake Ridge Acad. v. Carney*, 66 Ohio St.3d 376, 383 (1993)). As such, the doctrine of unconscionability consists of two separate concepts:

> (1) substantive unconscionability, *i.e.,* unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.,* individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible. Both elements must be present to find a contract unconscionable.

*Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 666 (6th Cir. 2003) (quoting *Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 758 N.E.2d 1173, 1181 (Ohio Ct. App. 8th Dist. 2001)). "The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable." *Taylor*, 117 Ohio St.3d at 358-59.

The Court finds that Boyd cannot establish that the Arbitration Agreement is procedurally unconscionable. "In determining whether an arbitration agreement is procedurally unconscionable, courts consider the circumstances surrounding the contracting parties' bargaining, such as the parties' age, education, intelligence, business acumen and experience, * * * who drafted the contract, * * * whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 67 (2009) (citations and internal quotations omitted). Other relevant considerations include "whether the parties

26

had alternatives to entering into the contract" and "whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print?'" *Arnold v. Burger King*, 48 N.E.3d 69, 85-86 (Ohio Ct. App. 8th Dist. 2015) (quoting *Blackburn v. Ronald Kluchin Architects, Inc.*, No. 89203, 2007 WL 4340861, at *4 (Ohio Ct. App. 8th Dist. Dec. 13, 2007)). Generally, the presence or absence of a single factor is insufficient to find that an agreement is procedurally unconscionable. *Hayes*, 122 Ohio St.3d at 68-69.

In this case, these factors weigh against a finding of unconscionability. The Arbitration Agreement was completely voluntary, and AT&T assured Boyd that he would face no negative consequences if he chose to opt out. (Doc. No. 1-3 at PageID#s 38, 40.) Boyd was also a management level employee with years of business experience working at AT&T, and AT&T provided him ample time to review and choose whether to accept the agreement. AT&T sent the first email to Boyd regarding the Arbitration Agreement on July 12, 2017 and provided him a full sixty days to decide whether to opt out by the September 11, 2017 deadline. (*Id.* at PageID# 38.) Nor were the terms of the contract hidden in fine print, as the Arbitration Agreement was a free-standing document not obscured by a longer contract and indicated on its very first page that "[u]nder this Agreement, you and the AT&T company that employs you ('the Company') agree that any dispute to which this Agreement applies will be decided by final and binding arbitration instead of court litigation.'" (*Id.* at PageID# 40.)

Boyd makes several arguments in support of his claim that the Arbitration Agreement is procedurally unconscionable, but the Court finds them unpersuasive. For instance, Boyd argues that AT&T was in a much stronger bargaining position than Boyd. (Doc. No. 10 at PageID#s 175-76.)

The Court finds this largely irrelevant, however, given that Boyd was under no pressure to accept the agreement and could have opted out at any time with no negative consequences. Boyd also asserts that he did not have a reasonable opportunity to understand the terms of the Arbitration Agreement because it consisted of four single-spaced pages containing legal terminology and, at most, he accessed it for only six seconds. (*Id.*) But Boyd was not limited to those six seconds to review the agreement. To the contrary, as noted above, AT&T provided Boyd two months to review the Arbitration Agreement before the opt-out deadline. This was more than sufficient to provide Boyd a reasonable opportunity to understand its terms. *See Smith v. Nationwide Mut. Ins. Co.*, 120 N.E.3d 72, 80-81 (Ohio Ct. App. 10th Dist. 2018) (finding the plaintiff "had the opportunity to read and understand" a seventy-page contract when he was given five days to review its terms). Finally, Boyd notes that AT&T drafted the Arbitration Agreement and that the rules governing the arbitration were contained outside of the Arbitration Agreement, as the agreement incorporates JAMS Employment Arbitration Rules & Procedures (Doc. No. 10 at PageID#s 175-76), but neither of these facts is sufficient to establish unconscionability. *See Love v. Crestmont Cadillac*, 90 N.E.3d 123, 129 (Ohio Ct. App. 8th Dist. 2017).

Accordingly, the Arbitration Agreement is not procedurally unconscionable. This conclusion is enough to defeat Boyd's contention that the Arbitration Agreement is unenforceable due to unconscionability. *See Taylor*, 117 Ohio St.3d at 364 ("As noted above, the party challenging a contract as unconscionable must prove 'a quantum' of both procedural and substantive unconscionability.").

However, the Court concludes that Boyd's unconscionability claim also fails for the independent reason that the Arbitration Agreement is not substantively unconscionable.  The Supreme Court of Ohio has described the substantive unconscionability analysis as follows:

> An assessment of whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable.  *John R. Davis Trust 8/12/05 v. Beggs*, 10th Dist. No. 08AP–432, 2008-Ohio-6311, 2008 WL 5104808, ¶ 13; *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* (1996), 113 Ohio App.3d 75, 80, 680 N.E.2d 240.  Factors courts have considered in evaluating whether a contract is substantively unconscionable include the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability.  *John R. Davis Trust* at ¶ 13; *Collins v. Click Camera*, 86 Ohio App.3d at 834, 621 N.E.2d 1294.  No bright-line set of factors for determining substantive unconscionability has been adopted by this court.  The factors to be considered vary with the content of the agreement at issue.

*Hayes*, 122 Ohio St.3d at 69.

In support of a finding of substantive unconscionability, Boyd points out that the Arbitration Agreement incorporates JAMS rules for arbitration, which Boyd contends could be revised at any time.  (Doc. No. 10 at PageID#s 176-77.)  However, courts have upheld arbitration agreements that incorporate specific rules by reference, as was done here.  *See, e.g.*, *Love*, 90 N.E.3d at 129-130 ("The agreement contained clear language that specifically informed the parties that the arbitration would be conducted by the AAA in accordance with the AAA rules and procedures, and included a website and phone number for obtaining additional information.  Because the arbitration agreement provided detailed information about how disputes would be resolved, it was not substantively unconscionable.").  Boyd also argues that the Arbitration Agreement does not adequately describe the costs associated with arbitration, such as case management and administrative fees.  (Doc. No. 10 at PageID# 162.)  But the Arbitration Agreement explicitly addresses this issue and provides that AT&T "will be responsible for paying any filing fee and the fees and costs of the Arbitrator" with

29

the limited exception for "an amount equal to the filing fee to initiate a claim in the court of general jurisdiction in the state in which" the employee is or was last employed by AT&T if the employee is the party initiating the claim. (Doc. No. 1-3 at PageID# 42.) Therefore, the Court finds that the Arbitration Agreement is not substantively unconscionable.

### iii. Whether Boyd Knowingly and Voluntarily Waived His Right to a Jury

Finally, Boyd asserts the Arbitration Agreement should not be enforced because the waiver of his right to a jury trial was not knowing and voluntary. (Doc. No. 10 at PageID#s 172-73.) In response, AT&T contends that this heightened knowing and voluntary standard is inapplicable because Boyd has no Seventh Amendment right to a jury trial on his state law claims and the FAA precludes the application of a special rule for proof of contracts for arbitration. (Doc. No. 13 at PageID#s 212-14.) In addition, even if a heightened standard did apply, AT&T asserts that Boyd's acceptance of the Arbitration Agreement was knowing and voluntary. (*Id.* at PageID#s 214-15.) Even assuming, *arguendo*, that a heightened knowing and voluntary standard applies in these circumstances, the Court finds Boyd has not shown that his acceptance was not knowing and voluntary.

Courts consider the following factors to determine whether a waiver of the right to a jury trial was knowing and voluntary:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Hergenreder*, 656 F.3d at 420-21 (quoting *Morrison*, 317 F.3d at 668). The objecting party has "the burden of demonstrating that its consent to the provisions was not knowing and voluntary." *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir. 1985).

30

In this case, the factors noted above clearly weigh against a finding that Boyd's waiver was not knowing and voluntary.  First, at the time he accepted the Arbitration Agreement, Boyd was a management-level employee with several years of experience working at AT&T.  Second, he had two months to consider whether to accept the Arbitration Agreement, which was plenty of time to consult an attorney had he chosen to do so.  Boyd contends he only accessed the Arbitration Agreement for six seconds, which was not enough time to understand and decide to agree to its terms. (Doc. No. 10 at PageID# 173.)  However, the fact that he may have only reviewed the agreement for a short period of time before the opt-out deadline is immaterial, as it does not negate the amount of time AT&T provided him to consider it.  Third, the Arbitration Agreement, as well as all three of AT&T's emails to Boyd, made clear that both Boyd and AT&T were waiving their rights to a jury. Finally, AT&T provided adequate consideration for the waiver by also agreeing to arbitrate claims it may have against Boyd.  Accordingly, the Court finds Boyd has failed to establish that his waiver was not knowing and voluntary.

Because AT&T and Boyd entered into the Arbitration Agreement, and Boyd has failed to show that the agreement is unenforceable, the Court concludes that it is appropriate to compel Boyd to submit his claims against AT&T to arbitration pursuant to the terms of the Arbitration Agreement.

### iv.  Whether to Enjoin the State Court Action

AT&T also requests that the Court issue a preliminary injunction enjoining the underlying state court action pending the completion of arbitration.  (Doc. No. 3-1 at PageID#s 127-30.)  Boyd has not opposed or otherwise responded to this request.  The Court finds that a preliminary injunction is warranted.

31

A district court's authority to enjoin state-court proceedings involving arbitrable issues is subject to the legal and equitable standards for injunctions generally, including the Anti-Injunction Act, 28 U.S.C. § 2283. *See Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 894 (6th Cir. 2002). The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The Sixth Circuit has found that enjoining state court proceedings is 'necessary to protect or effectuate [the district court's] judgments' when a district court finds that an arbitration agreement is valid and enforceable." *AT&T Mobility Services LLC v. Payne*, No. 3:17-cv-00649-CRS, 2018 WL 935441, at *3 (W.D. Ky. Feb. 16, 2018) (quoting *Great Earth*, 288 F.3d at 894). Thus, an injunction of Boyd's parallel state-court proceedings does not run afoul of the Anti-Injunction Act.

A preliminary injunction is also appropriate in light of the factors that courts must consider when issuing any preliminary injunction: "(1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017).

Here, AT&T has established a likelihood of success on the merits, as discussed above. In addition, allowing the state court action to proceed would irreparably harm AT&T, as litigating the state court action would be far more costly, protracted, and public than arbitration. *See Payne*, 2018 WL 935441, at *3 ("[E]njoining the state court proceedings, in light of the finding that the Arbitration Agreement is valid and enforceable, would prevent irreparable harm against the movant by avoiding

32

the expense and delay of trial.").  Conversely, an injunction would not harm Boyd because his claims can be pursued in arbitration pursuant to the terms of the Arbitration Agreement.  Finally, enjoining the state court action would serve the public interest by conserving judicial resources, expeditiously resolving the parties' dispute through arbitration, and providing fair and consistent application of the strong federal policy favoring arbitration of disputes.  *See id.* (enjoining state court proceedings in light of a valid agreement to arbitrate, in part, because the "public interest would be served by following the strong federal public policy of favoring enforcement of arbitration agreements").  Therefore, the Court will issue a preliminary injunction enjoining the underlying state court action from proceeding with respect to Boyd's claims against AT&T.

**IV.    Conclusion**

For the reasons set forth above, Boyd's Motion to Dismiss (Doc. No. 43) is DENIED, and AT&T's Motion to Compel Arbitration (Doc. No. 3) is GRANTED, as follows.

Boyd is compelled to submit all claims asserted against AT&T in the case styled *Boyd v. AT&T Services, Inc.*, Cuyahoga County Court of Common Pleas, Case No. CV-19-918231 (the "State Court Action") to arbitration pursuant to the terms of the Arbitration Agreement.  The State Court Action, insofar as it relates to Boyd's claims against AT&T, is enjoined pending the completion of the arbitration of Boyd's claims against AT&T.  Pursuant to 9 U.S.C. § 3, further proceedings in this matter are stayed pending the completion of such arbitration.  The parties shall promptly inform the Court when arbitration is complete.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date:  October 22, 2020          U. S. DISTRICT JUDGE